

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| WILLIAM STEPHENS, | § | No. 08-11-00166-CR |
| Appellant, | § | Appeal from the |
| v. | § | 362nd District Court |
| THE STATE OF TEXAS, | § | of Denton County, Texas |
| Appellee. | § | (TC# F-2009-2183-D) |
| | § | |

## **O P I N I O N**

Appellant William Stephens appeals his conviction for the offense of capital murder asserting that the trial court erred by admitting extraneous offense evidence.   We affirm.

### **BACKGROUND**

On the morning of July 2, 2009, Aaron Nick saw his roommates, Noah Whitehead and Mariesha Ohlfs,[1] having a conversation with Appellant in their home in Argyle.   Nick noticed that the three stopped talking when they saw him come down the stairs.   Later that day, Ohlfs dropped off Appellant and Whitehead in downtown Dallas.   Appellant and Whitehead got into a taxi cab at a Greyhound bus station.   Appellant sat in the backseat behind the taxi driver while

---

[1]  Ohlfs was Whitehead's girlfriend.

Whitehead sat in the backseat behind the front passenger seat.   The taxi first stopped at a Shell gas station where Whitehead purchased a bottle of beer.   The two men then directed the taxi driver to Appellant's house located in Denton County.

When the taxi arrived at Appellant's residence, Whitehead asked the taxi driver to give him his money and the taxi driver resisted.   Whitehead hit the taxi driver with his fists and then hit him on the head with the beer bottle.   Appellant reached around from the backseat, pulled the taxi driver's forehead back, and slit his throat.   Whitehead then stabbed the taxi driver in the heart.[2]   The taxi driver managed to get out of the taxi and Appellant exited the vehicle and proceeded to stab the taxi driver in the abdomen.   The taxi driver escaped from Appellant and ran towards a fence where he collapsed and died.   Whitehead and Appellant then placed the taxi driver's body in the backseat of the taxi and they drove through a locked metal gate onto a nearby oil lease property.   At that time, Whitehead called Ohlfs and told her where to meet them.[3]   When Ohlfs arrived at their location, Whitehead instructed Appellant to take the gas can out of Ohlfs' vehicle.   Ohlfs drove away and Appellant then got into the taxi with the taxi driver's body and drove further into the property.   About ten minutes later, Whitehead saw smoke coming from the direction that Appellant had driven.   Appellant drove back and Whitehead got into the taxi and they drove towards Appellant's house.   The taxi driver's body was no longer in the taxi.   The taxi stalled after they had driven about half a mile and Appellant drove off the road.[4]   They abandoned the taxi, ran through another oil lease property, and then Whitehead called Ohlfs to come pick them up.   Ohlfs drove to Appellant's house.   Whitehead

---

[2]  At trial, Whitehead testified that both he and Appellant were carrying knives.
[3]  Whitehead and Olhfs had been communicating by text message throughout the taxi cab ride.   In a text message, Whitehead asked Ohlfs to bring two gallons of gasoline with her.
[4]  Whitehead testified that he believed the taxi stalled because either the transmission pan or oil pan had been knocked off of the taxi.

and Ohlfs then proceeded to their own home in Argyle, and as they drove past the fire on the oil lease property, Whitehead threw his blood-soaked shirt out the window.

A Denton County fire marshal was dispatched to a reported grass fire off of John Day Road at approximately nine o'clock in the evening on July 2, 2009. Assistance from the Justin Fire Department was requested. Volunteers from the Justin Fire Department extinguished the fire and discovered a body. Investigators with the Denton County Sheriff's Office observed that the body had stab wounds to the chest and abdomen, cuts to the throat, and had been burned.

At the crime scene, a Denton County Sheriff's Office patrol officer observed that the entrance gate to the property had been damaged by a vehicle, and a license plate was stuck to the gate. He also found a trail of oil leading from the gate to the crime scene and a trail leading down John Day Road, to the location where a taxi had been discovered in some brush.[5]

Investigators matched the damage of the entrance gate to the taxi. A broken Budweiser bottle and a black-handled knife were found inside of the taxi. There was a puncture in the material of the front driver's seat of the taxi. An extensive amount of blood was observed inside the taxi. Blood was also found in the doorjamb of the front driver's seat door.

Investigators obtained GPS information from the taxi cab company showing the taxi driver's route.[6] Video surveillance footage obtained from the Shell gas station showed that Whitehead exited the taxi, entered the store, purchased a bottle of beer, got in the taxi and left. Investigators collected a black t-shirt that had blood on it from John Day Road.

On July 3, 2009, a tracking dog led investigators from the location of the taxi to within approximately a couple houses down from Appellant's residence. On July 4, 2009,

---

[5] It was later determined that the license plate that was embedded in the gate was associated with the taxi.
[6] The wires to the taxi's computer and GPS system were cut and the taxi cab company lost contact with the taxi after it stopped on John Day Road.

3

investigators met with Appellant at the sheriff's office and, at that time, Appellant provided information that led investigators to believe that he was involved in the robbery and murder of the taxi driver. After voluntarily waiving his *Miranda* rights, Appellant confessed to the felony offense of capital murder and told investigators about the clothes he was wearing during the murder and robbery and told them about the keys to the taxi. Appellant consented to a search of his home to permit the investigators to search for evidence in this case. At his residence, Appellant directed investigators to his bedroom to obtain the keys to the taxi and to his closet to collect the clothing that he had worn the night of the offense. Investigators seized and photographed a pair of blue jean shorts, a t-shirt, and the keys to the taxi.[7] Appellant also told investigators the location of the gas can, which was collected and booked into evidence.

Investigators subsequently obtained arrest warrants for Whitehead and Ohlfs as well as a search warrant for their residence. At the residence of Whitehead and Ohlfs, investigators found the taxi driver's personal identification, money, wallet, and credit cards.[8] A knife sheath was also retrieved from the residence.

DNA testing on the blood stains on the blue jean shorts collected from Appellant's residence showed that the blood was consistent with a mixture of the taxi driver's and Appellant's DNA. The black t-shirt retrieved from John Day Road and the knife recovered from the taxi contained DNA from both the taxi driver and Whitehead.

Appellant was arrested and charged by indictment for capital murder. *See* TEX. PENAL CODE ANN. § 19.03(a)(2) (West 2011). At trial, Appellant pleaded not guilty and a jury found him guilty of the charged offense. The trial court assessed punishment and sentenced Appellant

---

[7] The shorts collected by investigators were stained with blood.
[8] On July 3, 2009, Whitehead and Ohlfs used the taxi driver's credit cards at Walmart, Target, and Burlington Coat Factory.

4

to life imprisonment.    This appeal followed.

## DISCUSSION

## ADMISSION OF EXTRANEOUS OFFENSE EVIDENCE

In two issues on appeal, Appellant complains the trial court erred by overruling his objections to Whitehead's extraneous offense testimony.    He argues that the testimony was inadmissible under Texas Rules of Evidence 403 and 404(b).    The State responds that the trial court did not abuse its discretion in admitting the evidence because it was relevant and more probative than prejudicial.    Alternatively, the State argues that admission of the evidence is harmless.    Because the issues are related, we address them together.

*Standard of Review*

We review the admission of extraneous offense evidence for an abuse of discretion.    *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex.Crim.App. 2009); *Prible v. State*, 175 S.W.3d 724, 731 (Tex.Crim.App. 2005).    A trial court does not abuse its discretion if the decision to admit or exclude the evidence is within the "zone of reasonable disagreement."    *Orona v. State*, 341 S.W.3d 452, 464 (Tex.App. – Fort Worth 2011, pet. ref'd), *citing Montgomery v. State*, 810 S.W.2d 372, 380 (Tex.Crim.App. 1990) (op. on reh'g); *Oprean v. State*, 201 S.W.3d 724, 726 (Tex.Crim.App. 2006).    A trial court's determination on the admissibility of extraneous offense evidence typically falls within the zone of reasonable disagreement if the evidence shows:    (1) that an extraneous transaction is relevant to a material, non-propensity issue, and (2) the probative value of that evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury.    *De La Paz*, 279 S.W.3d at 344.

*Applicable Law*

Relevant evidence is any evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. TEX. R. EVID. 401. Under the Texas Rules of Evidence 404(b), evidence of other crimes, wrongs, or acts is not admissible to prove that the accused committed the charged offense in conformity with his bad character. TEX. R. EVID. 404(b). However, it may be admissible to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. TEX. R. EVID. 404(b); *Devoe v. State*, 354 S.W.3d 457, 469 (Tex.Crim.App. 2011); *Montgomery v. State*, 810 S.W.2d 372, 387 (Tex.Crim.App. 1991) (op, on reh'g).

These exceptions are neither mutually exclusive nor collectively exhaustive. *De La Paz*, 279 S.W.3d at 343. Rebuttal of a defensive theory is also a valid purpose for admitting evidence under Rule 404(b). *See Williams v. State*, 301 S.W.3d 675, 687 (Tex.Crim.App. 2009); *Moses v. State*, 105 S.W.3d 622, 626 (Tex.Crim.App. 2003). Accordingly, in order for an extraneous offense to be admissible, it must be relevant apart from supporting an inference of character conformity. *See Montgomery*, 810 S.W.2d at 387; TEX. R. EVID. 401. However, under Rule 403, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusions of the issues, misleading the jury, or by considerations of undue delay, or needless presentation or cumulative evidence. TEX. R. EVID. 403.

*Analysis*

The record establishes that at trial, outside the presence of the jury, the State presented testimony from Whitehead that he and Appellant were involved in another aggravated robbery of a taxi cab driver on June 28, 2009. Whitehead stated that during the June 28 robbery, Appellant

6

possessed the same knife he used in the instant case. Whitehead explained that during the June 28 robbery, Appellant sat behind the taxi driver and grabbed the taxi driver the same way as he had grabbed the taxi driver here, and had also used the knife in the same manner. However, during the June 28 robbery, the taxi driver's throat was not slit, but his hand was cut by Appellant's knife and the taxi driver managed to escape from the taxi. Appellant and Whitehead then stole the taxi and burned it.

Appellant objected to Whitehead's testimony asserting that it was prejudicial and that it violated Rule 404(b). The State argued that the extraneous offense evidence was being proffered to: (1) refute Appellant's defense that Whitehead and not Appellant was the responsible party; (2) show identity and intent to kill; (3) show that it was reasonably foreseeable that a murder would occur; and (4) prove intent to commit a robbery. The trial court overruled Appellant's objections and admitted the extraneous offense testimony. The trial court determined that the State satisfied its burden in showing that the evidence was relevant to a material issue other than Appellant's character and his conformity with that character and found that the probative value of the evidence was not outweighed by unfair prejudice.[9]

On appeal, Appellant argues that the State "failed to overcome its burden to include evidence of extraneous crimes" and "is wrongfully attempting to prove character and conformity through the introduction of the previous cab attack." We disagree.

In the trial below, the State had to prove beyond a reasonable doubt that Appellant intentionally committed the murder of the taxi driver in the course of committing or attempting

---

[9] We note that the jury charge contained a limiting instruction that instructed the jury not to consider any extraneous offense testimony for any other purpose unless it found and believed beyond a reasonable doubt that Appellant committed such offenses, if any were committed. The jury was further instructed that it could only consider such testimony in determining motive, intent, plan, knowledge, or identity in connection with the charged offense and for no other purpose.

7

to commit a robbery. TEX. PENAL CODE ANN. § 19.03 (West 2011). The extraneous offense testimony showed that Appellant was involved in a virtually identical aggravated robbery of a taxi cab driver which took place on June 28, 2009, four days before the taxi cab robbery at issue. In both taxi cab robberies, Appellant and Whitehead went to the bus station, Appellant carried the same knife, Appellant and Whitehead hired a taxi cab to drive them in a similar directional route, Appellant sat behind the taxi drivers, reached around the seat and grabbed the taxi drivers, and placed the knife at or around the neck area of the taxi drivers. During the June 28 robbery, the taxi driver caught Appellant's knife in his hand and managed to exit the taxi and run away, suffering only a cut to his hand. In the case at bar, Appellant successfully slit the taxi driver's throat and stabbed him in the abdomen. Thus, Whitehead's extraneous offense testimony was relevant to demonstrate Appellant's intent to commit a robbery, his intent to kill, and that it was reasonably foreseeable that a death would occur. *See Taylor v. State*, 920 S.W.2d 319, 322 (Tex.Crim.App. 1996) (where murder that took place ten days prior to murder in current case and both offenses were virtually identical, evidence of prior offense was relevant to show appellant's intent to cause victim's death, or at least that he knew victim would be killed); *Prince v. State*, 192 S.W.3d 49, 54 (Tex.App. – Houston [14th Dist.] 2006, pet. ref'd) (extraneous offenses are relevant to intent where the mode of committing the offenses and the circumstances surrounding the offenses and the current case are sufficiently similar). *Phillips v. State*, No. 14-02-01178-CR, 2004 WL 438613, at *3 (Tex.App. – Houston [14th Dist.] March 11, 2004, no pet.) (mem. op.) (extraneous offense evidence of prior robbery relevant to show appellant conspired to commit robberies and that he should have anticipated the likelihood of the victim's murder).

8

The extraneous offense evidence was also admissible to rebut Appellant's defensive theory that Whitehead, rather than Appellant was responsible for the capital murder of the taxi driver. *See Williams*, 301 S.W.3d at 687; *Moses*, 105 S.W.3d at 626; *see also Powell v. State*, 63 S.W.3d 435, 439-40 (Tex.Crim.App. 2001) (the admission of extraneous offense evidence to rebut a defensive theory raised in the accused's opening statement is within the trial court's discretion). At trial, during Appellant's questioning of Whitehead, Appellant advanced a theory that Whitehead was responsible for the offense:

> Defense counsel: Okay. And after that, you put him back in the back of the van. Correct, sir?
>
> Whitehead: Yes, ma'am.
>
> Defense counsel: And you called [Ohlfs] and asked her to bring you a gas - - a can of gasoline.
>
> Whitehead: Yeah . . . .
>
> Defense counsel: Precisely, your testimony was the plan in your head was to take the cab.
>
> Whitehead: Yes, ma'am.
>
> Defense Counsel: Correct? . . . Did you text her to bring you the gasoline?
>
> Whitehead: Sometime or other, I think somewhere in, like, Grapevine, I had texted her about that. . . . . .
>
> Defense Counsel: So you were actually getting the gasoline for . . . the taxi driver.
>
> . . .
>
> Defense Counsel: But my issue is, you admitted to - - on one of those statements you admitted to the investigators that, yes, you were the key person in this whole scenario.
>
> Whitehead: The only reason I probably said that was because I probably was the most intelligent person in the scenario at the time.

9

. . .

> Defense Counsel: As a matter of fact, you're not being quite truthful today. Do you understand that?
>
> Whitehead:   I'm completely honest.    I got conviction in my heart to do the right thing for [the taxi driver's] family.
>
> Defense Counsel: As a matter of fact, you really don't know the difference between right and wrong, truth and a lie, Mr. Whitehead.   You don't understand that, do you?

During closing argument, Appellant's counsel referred to Whitehead as a liar and a dummy "for even concocting the idea to do what he did."   The jury was told that Whitehead wanted the jury to believe that he was not the person in control.   Appellant's counsel stated that the jury "[had] no physical evidence to suggest . . . that [Appellant] had a clue about that knife" and that it was a reasonable deduction that Whitehead had kept the knife hidden until he used it. The jury was also told that there was no evidence that Appellant had any knowledge "that would give him the foreseeable ability to see that someone was going to get killed, even with regards to [the June 28 robbery]."   In conclusion, counsel for Appellant remarked:

> You heard Mr. Whitehead.   He is the brain.   He is the smartest of the group.   He is the one that, you know, texts and gives instructions: [Ohlfs], bring the gasoline; hey, [Appellant], go get the gasoline out of the Jeep.   And all of a sudden he takes off in the Jeep, [Ohlfs] takes off the other way, and he's left standing.   He was lying to you.

Based on the record before us, we find that the trial court could have reasonably concluded that Whitehead's testimony was not offered solely for character conformity purposes, but was offered to show Appellant's intent to commit a robbery, his intent to kill, or at least that it was reasonably foreseeable that a death would occur and to rebut a defensive theory.  *See Devoe*, 354 S.W.3d at 469 (admission of evidence under Rule 404(b) is generally within the zone of

10

reasonable disagreement and not an abuse of discretion if there is evidence supporting that an extraneous offense is relevant to a material, non-propensity issue).

Next, we turn to the question of whether the probative value of the extraneous offense testimony was substantially outweighed by the danger of unfair prejudice. *See* TEX. R. EVID. 403; *Montgomery*, 810 S.W.2d at 389. Rule 403 favors the admissibility of relevant evidence, and presumes that relevant evidence will be more probative than prejudicial. *Shuffield v. State*, 189 S.W.3d 782, 787 (Tex.Crim.App. 2006). Appellate courts should afford deference to a trial court's Rule 403 balancing evaluation and should reverse a trial court "rarely and only after a clear abuse of discretion." *Montgomery*, 810 S.W.2d at 392. In conducting a Rule 403 analysis, the following four factors are considered by the trial court: (1) how compellingly the extraneous evidence serves to make more or less probable a fact of consequence; (2) the potential of the evidence to impress the jury in an irrational and indelible way; (3) the time needed to develop evidence of extraneous misconduct; and (4) the degree of the proponent's need for such evidence. *Montgomery*, 810 S.W.2d at 389-90.

First, we note that we have already concluded above that the extraneous offense evidence was relevant to show Appellant's intent to commit a robbery, his intent to kill, or at least that it was reasonably foreseeable that a death would occur, and to rebut a defensive theory. Whitehead's description of the June 28 robbery was similar to his depiction of the events that took place in the instant case. His extraneous offense testimony was corroborated by Ranger Murphree who testified as to the recorded statements given by Appellant to investigators describing the two robberies which makes the element of intent in this case much more probable. *See Prince*, 192 S.W.3d at 56 (evidence of other robberies made intent to commit robbery more

probable). Likewise, it tends to make Appellant's defensive theory that Appellant was not the responsible party much less probable. Moreover, because the trial court gave the jury a limiting instruction on the use of the extraneous offense evidence, the evidence was not so prejudicial as to overcome the limiting instruction's effectiveness. *See Powell*, 63 S.W.3d at 439.

Although evidence of similar offenses certainly has the potential to impress the jury in some irrational and indelible way, we cannot say that the extraneous offense evidence of the June 28 robbery had that effect on the jury. *See Phillips*, 2004 WL 438613, at *4-5 (concluding second factor weighed in favor of admissibility although extraneous offense evidence was obviously prejudicial, it was not unfairly prejudicial because it was directly related to the elements of the offense appellant was charged with and extraneous offense evidence of a prior robbery did not end in physical injury or death, such that the jury would be incited to convict appellant of capital murder). As to the time needed to develop the extraneous offense evidence, the time the State spent presenting the extraneous offense evidence to the jury spans a little over two pages in an eight-volume record. Ranger Murphree's testimony explaining portions of Appellant's recorded statements describing the June 28 robbery consisted of a little more than a page and a half of testimony. Both the State and counsel for the Appellant made brief and minimal references to the June 28 robbery during closing argument. As such, an insignificant amount of time was needed to develop the extraneous offense evidence. *See Prince*, 192 S.W.3d at 56 (determining that jury was not distracted from the consideration of the indicated offense where prosecutor used a minimal amount of time to develop the extraneous offenses).

Lastly, because Appellant's intent to commit capital murder was a contested issue, the extraneous offense evidence was needed to show Appellant's intent to commit a robbery, his

intent to kill, or at least that it was reasonably foreseeable that a death would occur, and to rebut a defensive theory. *Id.* The trial court could have concluded that the State's need for the extraneous offense evidence was high. Based on the foregoing, we conclude that the trial court did not abuse its discretion in determining that the probative value of the extraneous offense evidence was not substantially outweighed by the danger of unfair prejudice. *See* TEX. R. EVID. 403. Because the trial court's ruling was "within the zone of reasonable disagreement," we conclude that the trial court did not abuse its discretion by admitting the extraneous offense evidence. *See De La Paz*, 279 S.W.3d at 343-44; *Orona*, 341 S.W.3d at 464; *Oprean*, 201 S.W.3d at 726; TEX. R. EVID. 403, 404(b).

*Harm Analysis*

The erroneous admission of an extraneous offense is non-constitutional error. *Johnson v. State*, 84 S.W.3d 726, 729 (Tex.App. – Houston [1st Dist.] 2002, pet. ref'd). Rule 44.2(b) of the Texas Rules of Appellate Procedure provides that any error, other than constitutional error, that does not affect substantial rights must be disregarded. TEX. R. APP. P. 44.2(b). Accordingly, even if the admission of the extraneous offense evidence was error, we would then have to determine whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." *Whitaker v. State,* 286 S.W.3d 355, 363 (Tex.Crim.App. 2009), *quoting King v. State*, 953 S.W.2d 266, 271 (Tex.Crim.App. 1997); *see* TEX. R. APP. P. 44.2(b).

If the error had no influence or only a slight influence on the jury's verdict, it is harmless. *Whitaker*, 286 S.W.3d at 363; *Johnson v. State*, 967 S.W.2d 410, 417 (Tex.Crim.App. 1998). When the reviewing court has "grave doubts" that the error did not affect the outcome of the trial the error is harmful. *Williams v. State,* 145 S.W.3d 737, 741 (Tex.App. – Fort Worth 2004, no

13

pet.).   A grave doubt is one in which "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error."   *Williams*, 145 S.W.3d at 741, *quoting Russell v. State*, 113 S.W.3d 530, 550 (Tex.App. – Fort Worth 2003, pet. ref'd). This Court must calculate, to the extent possible, the probable impact of the error on the jury in light of the existence of other evidence.   *Wesbrook v. State,* 29 S.W.3d 103, 119 (Tex.Crim.App. 2000).   In conducting a harmless error analysis, one factor to consider is the presence of overwhelming evidence.   *Id.; Motilla v. State,* 78 S.W.3d 352, 357 (Tex.Crim.App. 2002) ("our conclusion . . . that overwhelming evidence of guilt is a factor to be considered . . . applies to a harm analysis conducted under the current rules").

After reviewing the record in its entirety, we find that in light of the presence of overwhelming evidence the trial court's admission of the extraneous offense evidence did not have a substantial and injurious effect or influence on the jury's verdict.   The record establishes that the evidence presented against Appellant was substantial and overwhelming.   Appellant confessed to the felony offense of capital murder and provided investigators with details about the crime.   He consented to a search of his home and directed them to the clothes he was wearing during the murder and robbery and to the keys of the taxi.   A DNA test of the blood stains on Appellant's shorts showed that mixture was consistent with DNA from Appellant and the taxi driver.   In light of the foregoing, any error in the admission of the extraneous offense evidence was harmless. Issues One and Two are overruled.

## CONCLUSION

Having overruled both of Appellant's issues, the trial court's judgment is affirmed.

14

GUADALUPE RIVERA, Justice

August 14, 2013

Before McClure, C.J., Rivera, and Antcliff, JJ.
Antcliff, J., not participating

(Do Not Publish)

15